And we'll call the first case. Case number 08-0657, People v. Mayor Kando. I wonder if the state's attorney and the appellate defender would both step up and tell us who you are. Good morning. My name is Labita Popovich on behalf of the state. You have been here before. Yes. And you also wrote the brief because you're the third name on it. That means you did the work. That means you did the work. That's right. You're Mr. Bendick. Good morning, Your Honor. It's Christopher Bendick, assistant appellate defender. And is this your first time before us? How did you know, Your Honor? Well, you brought a group with you for moral support, which is perfectly appropriate. As a matter of fact, it's a good thing to see and to hear. But you also wrote the brief, right? Yes, Your Honor. Very good. I think you can safely assume, both of you, that we have read your briefs and are familiar with the facts set out in those briefs. Well, I would caution, perhaps, Justice Breyer. In this particular case, it's so fact-intensive, I don't think you should be discouraged from discussing the inflective facts, those that are relatively subtle that fold over other facts, because I think they're central to the case. That's a hint. You each have 15 minutes to address the Court. Mr. Bendick, you may save out from your 15 any portion you wish for a response. And you may proceed as soon as you're ready. May it please the Court. My name is Christopher Bendick, and I represent the appellate, Mr. Amir Kando. Today, during argument, I would like to focus on the first, second, and third issues in my brief. With regards to the fourth issue, I'd rest on the arguments in the brief. You mean the prejudice of the high sentence? Oh, the sentencing, yes. But I would answer any questions Your Honors have on that issue. The evidence presented at trial proved clearly and convincingly that due to his mental illness, Amir Kando lacked the substantial capacity to appreciate the criminality of his actions when he stabbed Jason Brilli on the night of July 23, 2005. Let's talk about the test for a minute, because that's so critical under these facts. Supposing someone, a defendant, is firmly convinced that he has a message from the angels to go and commit an act that on earth is considered a crime. Is he protected or isn't he under the insanity test? I think that depends on whether the defendant had prior mental health treatment, whether that story... No, I mean supposing at the moment he commits the crime, he feels he's on a mission and he can't refuse, but he knows that it's criminal. Well, if he knows that it's criminal, then he can appreciate the criminality of the action. Well, that's what I'm asking. Supposing he knows that under the laws of, under temporal law, it's prohibited, that particular act is prohibited, but he believes that the word from above transcends temporal law. In that instance, he would not lack the substantial capacity to appreciate the criminality of his actions. He would know that it's a criminal action, even if he is getting it from God. However, that is not the precedent in this case, Your Honor. Well, supposing there are indications that he's aware of the fact that his act is not approved of by law enforcement, such as taking some degree of concealment, of avoidance, of evasiveness, supposing he lies about what he does, reflecting at least the fact that while he may not disapprove of what he did, there are societal interests that disapprove of that. You think that would be fatal to your position? And be careful on that one. Your question is that if the defendant, prior to the crime, had a message from God, but understood that it was a crime, or is that part of the question? Understood that it was breaking the law for which he could be punished. Well, by the definition of statute, that would be lacking the substantial capacity. Well, with the fact that someone commits a crime ostensibly because he's performing a, he's on a mission, I don't want to be invoking the Blues Brothers here, but on a mission from God, you know? But he knows that, but he takes evasive action to make sure that his crime should be undetected, or makes an effort to make the performance of his act less detectable. Wouldn't that be a sufficient basis from which to infer an awareness of societal disapproval? And we see that in McCollum, Your Honor. And this case is an opposite to McCollum, because... All right, I won't press the third question at you until you have a chance to develop your argument. Your Honors, the... Pando proved by clear and convincing evidence that he was legally insane on the night of the crime. However, due to many misconceptions by the trial court, to what evidence was actually presented at trial, the trial court rejected Pando's argument with unguilty but mentally ill. Now, these misconceptions were further augmented by trial counsel's failure to impeach two state witnesses when ample impeachment material... Well, supposing we pass that for a moment, if we can. And you might as well learn now that oral arguments are meant really to take place orally, and we don't necessarily permit you the opportunity or the latitude to follow script. You know, so we've got to ask you some questions. Sure. Supposing we accepted the fact that he said, I stabbed him, he jumped me, to Nelson. Instead of, he jumped me, he stabbed me, or he jumped me, I stabbed him, he jumped me. In reference to Officer Hunter. I'm going to your facts. Supposing we eliminated that conception. And supposing we accepted the fact that Nelson, who testified to this supposedly unfocused statement from the defendant, that Nelson never told the police about it. Although he had ample opportunity and, let's assume also, ample obligation to tell the police that when they interrogated him. Now, we accept that fact. Is that the be-all and end-all of the state's case? I would say the rest of the state's case would be, they would say that the running from the scene, going up to his apartment. But that is explained by, if you look at Baker, Your Honor, white does not necessarily mean guilt. In Baker, a defendant left the state, went to Nebraska. A day later, he's found. Now, does Baker tell you that the state cannot argue inference out of those facts? No. Or does Baker simply tell you that on the basis of the totality of the evidence in that case, that particular inference is not decisive, not clear or dispositive enough to turn the result? That's exactly right, Your Honor. What a coincidence. I wrote Baker. You did, Your Honor. As long as we're on Baker, I was hoping you were going to get to it, because I have some questions about it. I'm sure you're thoroughly familiar with it. But finish your answer to this question. Or was there a question pending? That that would be, would not be dispositive is what it would be. Baker's a good case for you, isn't it? It is, although it is under the old standard that was proposed. Ah, you mentioned the old standard, and you even cite to the old standard in a footnote in your book. Was your burden at the time of the Baker case more stringent or less stringent than it is today? It's less stringent, because now it is clear and convincing evidence, Your Honor. So, all right, now, in addition to that, was there any other elements to the issue of insanity under Baker that aren't present here? Under Baker? I don't believe so, Your Honor. Do you recall how the insanity statute was phrased in 1993? I do not, Your Honor. Did it have more than one component? I would have to say I'm not familiar. I can brief that issue if you would like, Your Honor. Well, let me help you out a little bit. The insanity statute was amended, then found unconstitutional, then reenacted. The unconstitutionality had nothing to do with the substantive provisions in the statute, as you probably know, because you indicate your awareness of it in your brief. So it was reenacted. And in addition to heightening the burden of proof from a preponderance of the evidence to clear and convincing, it also deleted from the definition of insanity a component which was present in the 1993 statute. Do you remember or recall what that component was? I would have to look at it. Okay, because then I can't really stick the next question to you because you're not familiar with the component. But you do agree that your burden now is more stringent than it was at the time that Baker was decided? Yes, and now it's a highly probable standard, Your Honor. Do you have any notion as to what the public policy behind that might have been? I do not, Your Honor. Clearly the General Assembly decided that your burden of proving insanity would be more stringent under the current law than it was under the old law, but you don't have any idea as to why they may have enacted it that way? I have not taken committee notes, Your Honor. Do you know what happens to somebody who's found not guilty by reason of insanity? Yes, Your Honor. And what happens? According to the mental health statute, there's a hearing conducted where evidence is presented and whether that individual should be civilly committed. Okay, have you read that particular section? I briefly read it, Your Honor, yes. You briefly read it? Yes. Do you have any opinion about it one way or the other as to its, let's say, constitutionality? I wouldn't say one way or the other, Your Honor. Okay. But you do agree that the clear and convincing standard that's imposed upon you now is more stringent than the one that was imposed on the defendant in Baker? Yes. Okay. But you do agree also that the standard of review is still manifest way to the evidence? It is, Your Honor. So that if you can meet that standard, you're still entitled to, if it is beyond the manifest way of the evidence, contrary to the manifest way, you still win under either burden of proof. Exactly. And particularly when there was absolutely no expert testimony offering to rebut the testimony of your two experts. We have two, and they're state-employed experts, Your Honor. These weren't hired by the defense. I'm not sure that, you know, Baker mentions that they're state-employed, too, but that's really a pejorative recommendation, isn't there? The Baker court used that phrase. I don't think it was used by the Baker court to reflect that aspect of it. I think, to the contrary, it was used by the Baker court to reflect the fact that, undoubtedly, the state searched high and wide for an expert and couldn't find one to corroborate their position. And not to, in any way, reflect on the fact that there might be a bias. Because the terms of some employees, its own, what you would consider to be inferior employees, wouldn't even testify on their behalf. All right. You see what I have to put up with up here? Well, I mean, with the two state-employed psychiatrists finding Kanda legally insane, there's no testimony by any witness for the state, whether export or lay, that says the defendant was sane at the time of the incident. You have Jason Burley testifying through stipulation that Kanda was yelling, The problem is, counsel, we are stuck with our perhaps blessed, depending on one's point of view. I give a bit more credit to the neurological and psychiatric sciences. I'm even willing to call them a science. The dynamics of psychiatry to be scientific rather than anecdotal or mythological, as some might pejoratively claim. But even so, in that respect, we're still stuck with the law that permits these decisions to be made through lay opinion. And I suppose I would think that as the century progresses and as the brain becomes more and more accessible to experimental study, that at least the conclusion of some that it's too inexact will fade. And what will be left only is the suspicion that the psychiatric profession is somehow more accessible to be employed in the service of a party more so than experts in other areas. And I would think that that should fade away as well. But in the meantime, we have the fact that lay opinion is sufficient. Credible lay opinion. Yeah. And in this case, you do not have credible lay opinion. Well, what about the fact that you have both psychiatrists who testified in favor of the defendant were not available to examine the defendant in close proximity to the occurrence of the crime. One was three months later. One was two years later. So they had to rely on records made by other people. That's kind of a weakness, is it not, in the testimony. I believe actually in Garcia we have a similar situation. Three months afterwards, the determination of Sandy. Well, the issue was raised in Baker as well. It's summarily dismissed in a very succinct and very well written paragraph by the author. On the other hand, what you had here was a hospital record on the same day of the occurrence certifying to, I don't know if this is schizoaffective or schizophrenia diagnosis that they made, but that diagnosis was affirmed at least in a hospital record that was virtually contemporaneous to the crime. And we have that here as well, Your Honor. Well, here, yes. And it is admitted to the hospital, jail hospital. He's delusional, appears to have acted on delusions, having hallucinations with satanic themes. He has a high level of anxiety. We have that here, Your Honor. And in case you don't think I've been lobbing softballs to you, here's one that I will even label a softball as I'm lobbing it to you because I want to hear from your opponents as to how they intend to handle this. If you look at the nature of the crime here, there is no rational motive or explanation for it. If you accept the fact that Jason, the victim, was barely known to the defendant, that they had no previous encounters, that the defendant had no personal involvement with the neighbor or any of the neighbor's interests, so that the whole basis of the crime has got to be something that was solipsistically concocted, namely in his head, as opposed to external stimuli, which he labeled the gap in the tooth as the persona of Satan, that that plays an important factor as opposed to other cases in which there are collateral motives or incentives which simply show volatility rather than incentive. Well, if you look at West, you have sexually motivated crime. You have Gilmore. It's a burglary. Why should that have anything to do with it? It's indicative of the motive of the crime. Because there's no rhyme or reason for it. But the State never has to prove motive, so why should motive even be an issue? It should be a factor, Your Honor. A factor in what? In determining whether or not what? One was seen at the time of the incident. Okay. And in McCollum, you have a clear motive. There is case law that says it can't be the exclusive factor, but it certainly can be a substantial factor. When there's no other explanation for it other than something that is not of this world or of this culture. Well, the only question then becomes whether or not the lack of any motive proves insanity or whether it simply proves a mental disease. Well, that's a question mark. I just threw that out there. But that's why I asked my original question, supposing you have the... Which I thought was the most incisive question in the book. Supposing you have the message from God, but you also know that it's in disregard of the temporal law. And we don't have that here. What would Thomas Aquinas say about that? He operated probably under a different definition of insanity, which wasn't quite as refined as the one we have today. Because I know that you're well-versed in Jesuit lore. You need about five minutes to really complete your argument. We've given you almost 30 minutes, so you go ahead and finish up. Your Honor, for all the reasons in my brief, I would ask this Court to reverse the trial court's finding and our finding of not guilty by reason of insanity. On the other issues, on the second and third issue, I would ask this Court to reverse the trial court's decision and remand for a new trial in regards to the fourth issue, and to remand for a new sentencing hearing for a period of time and remainder of rebuttal. Thank you, Your Honors. We'll give you an opportunity, Mr. Bendick, to respond to the argument of the State's Attorney. With all of the resources available to the State, why couldn't you find at least one psychiatrist who would disagree with the two who testified? That's an excellent question, and probably one better answered by the trial assistant that tried the case. But from my own personal research, that was not available to us at the time that we took this trial. At least you're not saying because the sanity, as opposed to the insanity, was so evident that you thought it was self-apparent. Oh, certainly not. I mean, this is a very unfortunate case that, admittedly, had it been under a different standard. That raises a second question, which, again, is rhetorical and is not dispositive of this case, nor is the first question dispositive. We decided on the basis of what's already before us. And even though I seem to be slanted, that doesn't mean I'm going to go that way. I play devil's advocate as much as anything else. But the next question is, why would the prosecution arm of the executive's office feel the need to prosecute cases where you can't find psychiatric support to counter what appears to be, at least externally, manifest involvement of a hallucinatory disease? Certainly a very, very fair question in this case. I mean, there are so many budgetary problems. And you have here a history of insanity going back 15 years with the taking of psychotropic drugs that were reduced in content, which nobody denies, with Dr. Reeves' approval, eliminating one of the medications and substituting another, and a history two years or three years down the line with a finding of unfitness for trial two years later or a year and a half later and only found fitness long afterwards or when medications were readjusted. Why, in the name of a budget, of economic efficiency, would there be a need to pursue this case as opposed to so many other crimes that are waving in the wind? Certainly. And that actually brings me back to the initial case, the initial question you asked the defense attorney, and that is whether the defendant in this case could appreciate the criminality of his behavior despite the fact that he may have thought that Jesus or a higher power had told him to do that. And our case law, our law tells us that even if someone is mentally ill, they can still be found criminally liable. Well, my trick question to your opponent was the second component that used to be part of the definition of insanity was the component you have just addressed, coupled with an inability to conform his behavior to the law. Right. They dropped that out of the definition of insanity somewhere along the line. In fact, I think it was still part of the definition at the time Baker was deciding, but it's no longer the case that he has the advantage of that definition of insanity, unable to conform his behavior. Exactly. Which led to the very first question that Justice Gordon asked. But that still doesn't take away from you the burden of proving him guilty but mentally ill beyond a reasonable doubt. Certainly. And you have the burden of overcoming at least a prima facie case. Absolutely. His burden is by clear and convincing evidence. Right. But at least when he puts on two psychiatrists who say this man was insane at the time that the crime was committed. Plus hospital records, pre-existing and post. Other than the judge's analysis of that testimony, what lay testimony, what series of facts do you rely upon to rebut that psychiatric testimony? There's got to be something there. Certainly. And there is. Lay testimony. But what was the lay testimony? Or are you relying on a whole series of factual situations? No, I'm relying on the lay testimony. An argument to substitute for lay testimony. Did anybody say he was sane? In the State's case? Yeah. No. We didn't have any State experts that came and testified that he was sane. Any lay person? Did any lay person testify that in his opinion at the time that they saw him? Did any of the police officers ask their opinion? The police officer, it was Officer Hamid, that testified as to how the defendant reacted at the time of the incident. And that he was coherent enough to answer the door when he knocked on the door, that he showed him where the gun was. But was not evasive. He was initially evasive. Well, Hamid's testimony countered that, diluted that to some extent. Nelson's testimony was that he was evasive because he testified at least that in court that he was told by Amir that Jason stabbed him and jumped on him. Correct. But very heavily impeached because that seemed Nelson, who was the stepfather of Jason, was sitting with that information for two years after countless opportunities and interviews with the police and never disclosed it. But when Amir answered the door for Hamid, presumably the planting of the knife in the pantry was immediately disclosed. When Hamid, I think, asked for the knife, or I don't even know that he asked for it, Amir went to the pantry and fetched it for him. The only thing left there is the shedding of the bloody clothes. Why did he do that? And the explanation was he didn't want to startle his mother with it. But evidently there's no testimony that I recall that he hid these clothes. He just took them off. That's part of the state's point as well, and that's what was argued at the trial, was that these two experts, Nadkarni and Guzman, at that time, didn't question him about his mentality on the day of the incident. And that's a very telling point. I mean, there's two state experts at this point who didn't question him about why did he do this. Well, there is also some testimony that he gave to the hospital, which the state uses against him, where he said to the medical personnel, I have delusions. I have delusions, yes. The judge characterized in his statement as saying, I'm having delusions when he said I have delusions. But to me, that's totally neutral because a schizophrenic is not mentally challenged as such. His IQ isn't eroded. He understands when the doctors, and he may have some intermittent lucid moments, and when the doctors tell him you have delusions and he's been through a long course of treatment, he simply reiterated that almost as a child. But he didn't say he was, he didn't say I'm having delusions because that would characterize the fact that he might be malingering. If he's that defensive in saying I'm having, because people who have delusions are not sufficiently, at least the assumption is, not sufficiently aware of their having delusions to be able to transcend it with a statement characterizing their delusional moment as one in which they're having the delusion because for them the delusion is reality. Both doctors actually testified he, because of his mental illness, would not be able to articulate that he has had delusions. Except that this was in a calm moment, and he was reiterating to the medical personnel his symptoms. And he never concealed that. And that doesn't come into play in establishing that he was in a calm moment when he went and stabbed his neighbor for no ostensible reason other than to follow through to a divine, in quotes, commitment. And the question at this point is did he understand that at that point, regardless of what divine powers may have told him internally to do this, did he understand the criminality of his behavior? I know McCollum is a good case for you, and really there's a surprisingly few number of cases since 1993 that we can rely on. But McCollum is not a good case. Well, it's a good case for him. Oh, I'm not a good case for him because in McCollum there's an alternate motive that's quite rational. The security guard that he killed had an altercation with this fellow a day before, and evidently this guy might have been a homeless guy or a mendicant or something, and he had an encounter where the security, this was his security officer, roughed him up, admittedly, punched him. That's true. And in McCollum he did do that. So he had a rational motive in play against the so-called psychotic motive. Right, but as Justice Cahill pointed out earlier, and that is true, the State does not need to prove a motive in this case. The motive was because he had a divine power. Yeah, the State still has to do some overcoming. Make a prior first appeal. Yes, so it certainly counts along those lines. Certainly. It is a factor, but it is not the dispositive factor by any means. So what are you left with? Well, what we're left with is, first of all, that the defendant walked back and forth in front of the victim several times and then consciously went back to the apartment to retrieve the knife. So what does that spell, exactly? How does that spell out rationality if there is no other motive manifest but the psychotic one for committing the act? How does this matter to us? Well, this matters because he consciously went to retrieve a weapon in order to perpetuate the crime. How else is he going to carry out his mission? Well, if he wanted to. I mean, by multiple, you know, he could have picked up a rock, he could have picked up a straight one, I don't know. But just because he's schizophrenic doesn't mean he's stupid. It's quite the contrary. Schizophrenic people generally are very cunning. Exactly, absolutely, absolutely. And because of that, it also doesn't mean that he doesn't appreciate that what he did is wrong. So how does walking back and forth and going to retrieve the weapon establish an inference that he was aware of the fact that it was criminal? I don't follow. It's not just that factor. The rest of it is that once he did that, he did flee the scene. He did tell Nelson. He didn't flee the scene. He went upstairs to his apartment and locked the door but opened it to the next person who knocked. No, he didn't because the next person that knocked was Nelson. Nelson, right. That's something you have to do. He did flee from the area because they lived in an apartment complex. So he did run back to his apartment. He didn't open the door initially. He did tell Nelson. He didn't open the door to Nelson, but he opened the door to Hamid. Exactly, and to Hamid he said, I stabbed him, he jumped me. And he said that to Nelson as well as he was running up the stairs. He said, he jumped me, I stabbed him. So in point of fact, Jason did jump him. So it's really a question of inflection. Did he mean to indicate that he stabbed him because he was jumped? Or is he simply saying I stabbed him and he jumped me? Right. Just to clarify, Jason actually doesn't testify to that, and that's why this statement, there's much more made out of this statement now in hindsight, with analytical hindsight, than there was at trial. At trial, Jason testified, he came behind him, tried to slit his throat, then came in front of him, stabbed him twice, at which point Jason grabbed his wrist and pushed him back. And that's consistent with what Officer Hamid testifies to, and it's consistent with Officer Carrillo who was brought in via stipulation in the defense case as to what Jason said. So even Carrillo's testimony is that the victim grabbed the defendant and wrestled him to the ground. At no point is the whole jumping brought to light, and that's why I believe more is made out of this now in appeal than was at the trial when the trial court could actually assess it and determine it. Do you think that this statement, I stabbed him, he jumped me, is sufficient to be dispositive of the state's position? I think it has to be a totality of the factors. It satisfies the manifest weight of the evidence standard that would have to be breached? That statement alone, no, but the totality of the circumstances. What totality? Retrieving the knife. But I don't see how that plays into this at all. Because what other motives are you giving him? It's one thing if for some reason Jason gave him a dirty look or said something nasty to him, and then he went and retrieved the knife. Then you have a McCollum situation. But he believed that he had had this exchange with Jason regarding Jesus, regarding being a righteous man. He believed what he had told him. I can just as easily turn that scene into one that corroborates the fact that he was acting psychotically. He circled him or paced in front of him, looked at him, went upstairs and got a knife and killed him. How does that help the state? Because that part doesn't. Okay, but you're in the process of listing. You said that I stabbed him, he jumped me is not of itself dispositive. I don't mean to put you on the spot, but that's what this whole case is about. Absolutely. So what other data do you have? No, that isn't what this case is all about. I have to disagree with you there, Judge. That's not what it's all about. It is all about that. The question is whether there is sufficient inference in the facts to justify a finding of rationality of appreciation of the criminality of his act. And that depends on these isolated facts. And the trial judge looking at the totality of the circumstances, which included not just him going back to get the knife, fleeing from the scene, and their heightened verdict of proof, since Baker. Absolutely. As I was saying earlier, perhaps there are hundreds of evidence. All I am saying now, what inference, what provides the basis for inferring that he had an appreciation for the criminality of his act? We have the statement, I stabbed him, he jumped me. Right. What else? So we have a statement of self-defense, which is an important factor. Okay, that's one. But you said that was not dispositive. We're not going to hold you to it. You can take it back. You can say it is dispositive. That's an important factor. That's the totality of the circumstances that the state was operating under. It's the self-defense statement. It is him taking off his clothes and hiding them. Where did he hide them? In his room. He left them in his room. He was in his room. He took his bloody clothes off. Right. Why is that indicative of a sense of guilt that would be a basis for inferring appreciation of criminality? That, coupled with the self-defense statement can be inferred. So those two are sufficient for you. Plus, third would be hiding the knife in the pantry behind the door. The knife belongs in the pantry. There's no evidence of that. Did he refuse? Did he try to deny having it? No. Was he asked for the knife, or did he volunteer it? He was asked by officers. And he answered, and he immediately, on first bounce, went and fetched it. Sure. So how would that, how much weight do you suppose that would add to the influence that he was aware of the criminality of his act? Well, it certainly does add weight to it. How much weight? An ounce? A percentage? A ton? I would, if you, if all three were thirds, then that would be 100% for the totality of the circumstances. With taking his clothes off, hiding the knife, he could have answered the door, he could have waited. I mean, the question is, did he appreciate the actions at the time? Does someone who's schizophrenic wear bloody clothes in his own room? I couldn't answer whether they do or not. The question is, did he understand? Did he try to wash it? Well, he wasn't outside. He wasn't in a laundry room. Did he put it in a garbage pail? This is no different than another defendant who doesn't have a mental illness running back to his own house. The evidence here, at best, is very thin, isn't it? The question is, thin is okay if it's enough. Thin is okay. It's okay if it's enough. And that's the question here, isn't it? It is enough in this case. Is it fairly clear that the statute defining insanity is more restrictive than it was at the time of Baker? Absolutely. And as I was saying, Not only with respect to the burden of proof, but with respect to an elimination of one of the elements, which was the old compulsive argument. In the old days when we were arguing about insanity and what insanity meant, and one of the definitions, the classic definitions for insanity was compulsion. And that is no longer a definition of insanity. Now, the interesting thing about this case, it seems to me, Judge, is that since Baker we haven't had a case in Illinois that has defined the new elements of the insanity definition in terms of facts before us. He's nodding his head because he looked for all and he couldn't find it either. And neither could you. Here's the bomb that I'm going to drop this bomb on you, even because I really want to drop it on my colleague here. The question is, how would that difference in the statutory language make a difference here? Oh, it makes all the difference in the world. Because under preponderance of the evidence, which is the lowest threshold standard that the defendant would have to show that he was mentally insane, that's a low standard. Under clear and convincing, not so much. On the basis of these three or four factual fragments that would tend to show awareness of the crime, wouldn't that play the same under either standard? Well, the other component, as Justice Baker mentioned, was that the factor that was taken out was the inability to conform. So the state doesn't have to show that. And here is a very simple way of looking at it, which Justice Gordon alluded to in his very first question to your opponent. God ordered me to kill him, even though I knew it was against the law. And that's exactly it. That would have been admissible as a component of the insanity defense in 1993. Is it not? No, it's not. The question still remains whether those bits of evidence, the statement, I stabbed him, he jumped me, the shedding of the clothes in his own room, the fetching of the knife from the pantry, are sufficient to establish his awareness of the criminality of his act. And those are the three pillars that the state's conviction rests. And I submit that those pillars show signs of buckling. But they haven't buckled, and that's kind of where we're at here. We have three factors, but we also have the cross-examination, which is very lengthy, of both of these experts. And the trial judge goes at length to discuss why she chose to discredit, as you said, two highly educated state-employed psychiatrists. And the main reason, one of the main reasons, is that they didn't ask him about the day of the incident. One of the psychiatrists interviewed three months after the incident, the other a year later. Does anyone propose that his mental condition at the time of this act was any different than what it was on the dates that he was interviewed by Dr. McCarty and Dr. Guzman? Oh, absolutely. Did Dr. McCarty interview him? It was Dr. Guzman that interviewed him three months after. He was found unfit. He was immediately unphysically ill. But when he was interviewed before his medications were readjusted and when he was first found unfit. Is anyone here claiming that on the date of the occurrence he was sane? He was mentally ill. He was mentally ill and not infected. Is anyone saying that he wasn't as psychotic at that time as he would have been on subsequent examination? Or is anyone denying the diagnosis of the hospital where he was sent on the date of the crime? As far as the diagnosis, no one denies it. He is mentally ill. So how does the court focus? I thought the court was focusing on something perhaps even worse, the fact that there was no testing for malingering. That is mentioned in both of the doctors' accounts. And that seems to be, frankly, a difficult one to swallow in light of the fact that the psychiatrists both testified that they saw no need to test for malingering insofar as they were persuaded by his background, by the context, by the situation itself, that there was no suspicion of malingering so that the test for malingering would have been a waste of money. That is one component of what the trial court considered. But there's lengthy pages of the trial. Did the trial trial court become a witness in this case? Did the trial judge? No, the trial judge articulated what she saw during the trial as the trial judge was. I mean, you have set out a very fair and even and balanced statement of facts. For which you should be complimented. But one of the things that that statement of facts makes clear is that the judge in this particular case was very, what's the word we want to use? Proactive. Because there was really, there wasn't a single person who testified for the state on the precise issue that the defendant had placed at issue. That is, whether he was insane or just mentally ill. And yet there wasn't a single individual from the state who ever even really came close to addressing that issue. Except, of course, for the judge. Well, the judge presumes that the defendant is sane, unless he proves by clear and convincing evidence that he was insane. So the trial judge was correct in starting with that premise. As far as rejecting the expert's testimony, she then chose to rely on the lay witnesses, which was Officer Kameen, the victim, and Nelson, in terms of how the defendant reacted. Tell me something. What do you think generally, and I'm playing with you. What do you think generally of judges who, let's say, might have degrees, undergraduate degrees in accounting, political science, English. English. English would be a good major. What do you think of judges deciding the medical, the pathological element that goes into the definition of insanity? Whether someone is under the grips of a psychotic event in committing a crime. Do you think that judges should be making that decision on their own? Well, I believe that... Without any help? Well, I believe at the Judicial Judges College, some of that is covered, whereas the judges are trained in how to evaluate this testimony. Well, the General Assembly has defined the word, and we're bound by that. The General Assembly has chosen to define in the Mental Health Code the word insanity. Oh, certainly, and we have that under... And we have that definition, and we all have to live with it. No, I live with it, and I live with it. They can't appreciate it. But it's a very imposing burden. Absolutely. Absolutely, it is. It's a much trickier case than, you know, other cases that don't involve... Don't give away too much now, just because he complimented you. No. My point is that the judges can certainly appreciate it and listen to the expert testimony. But don't you think that it would be nice to help them with some psychiatric testimony? If they all had medical backgrounds, it would be wonderful. Anything else you want to make sure that we understand about this case? Just in closing, that despite the fact that the defendant was mentally ill, the facts pointed that he did understand the criminality of his actions. And that's what the State presented at trial, and that's what the State rests with today. Thank you. This stood up very well under my jurisdiction. Mr. Vendick. Just briefly, Your Honors, I'd like to address the three facts the State claims that are the pillars of this case. The statement about jumping me. There's testimony by Burleigh that when he pushes on the wrist, they fall, causing candle to fall on him. But it could be interpreted contextually as copying the plea, as giving an excuse. On the other hand, I could see the other side of it, too. You know, if Satan falls on him, you know, jumps him. I stabbed him, but Satan fell on me. I mean, it cuts both ways. The question is whether the trial court is precluded from leaning toward the one interpretation that he was trying to mitigate his conduct. And if he's mitigating his conduct, there is inferentially an awareness that there is something here that he has to mitigate. Well, then that goes to the trial court's complete misconception of what the evidence was presented at trial, claiming that the first statement that is made to officer Hamid is, you know, he jumped me and stabbed me. Or excuse me. Yeah, but even he jumped me. What's the purpose of that? You know, I stabbed him. It serves the purpose of some sort of function. But what need would he be fulfilling by espousing the fact that he was jumped, either before or after he was stabbed? Well, after he's, you know, I stabbed him. Why would you say he jumped me? He's relating the course of events. He's telling what happened. I mean, that's exactly what Bertley testifies to. So he's being a journalist. He's telling what happened. I mean, he's relating what happened during the events. And in regards to the knife, it was still bloody, and we have no testimony that the knife didn't belong in the pantry. The state has introduced no evidence on that. But he didn't wipe the blood off. Absolutely. And regarding this bloody shirt, take a look at People's Exhibit 11 and 12, Your Honors. It's on the floor in his bedroom. It's not hidden in a, it's not even in a hamper. You know, it's not in the closet. It's not hidden at all. It's just taken off. So those are the three pillars of the state's case that the state has just announced. In regards to the trial court's misconceptions, Your Honor, clearly the trial court based its determination on things that weren't presented in evidence. Regarding officer, the statements officer made, he jumped me and stabbed me, that's an error. The fact that Dr. Ned Kearney. Was there any evidence about his failure to take medication that she relied on so heavily at the sentencing hearing? Was there any evidence of that? There was no evidence presented at all, Your Honor. I didn't think so. Where did she come up with 15 years? Do you know? Excuse me? Where did she come up with the 15-year component? I don't know, Your Honor. Do you know what the maximum would have been for this? It's 30. It would have been 30. It was a class X felony. Okay. So the minimum was seven, six. Six. And the maximum was 30. Yes, Your Honor. Did it occur to you some of the ironies that you're faced with when you're arguing for not guilty by reason of insanity as opposed to guilty but mentally ill and a reduction in the sentence? Has it occurred to you? I have to argue the issues that are presented, you know. But under 100524, we could, for example, just arbitrarily, not arbitrarily, but we could ourselves reduce his sentence right now. Yes, Your Honor. And we could reduce it to the minimum of seven years. Or six years, Your Honor. Or six years. I'm sorry. If he were found not guilty by reason of insanity, he could end up being in custody for 30, couldn't he? That would be a possibility. That's one of the ironies of this mental health code. It is. And, unfortunately, that's what is presented in this case, is that this defendant was not guilty by reason of insanity, Your Honors. And that's what the evidence proved at trial. And because the trial court didn't base its ruling on the evidence that was presented, and because of trial counsel's failure to impeach the state's witnesses, we have this guilty but mentally ill ruling. Okay. So I'd ask that this Court grant the relief that is asked for in my briefs. And I thank you for your time. Mr. Bendick, thank you. Ms. Popovic, thank you. The State and Mr. Kondo were both well served by your briefs and by your oral argument. One thing that I can concur with is my colleague here. Oh, we might also add that Justice McBride should have some fun listening to the tapes. Thank you.